

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NAUTICAL SOLUTIONS
MARKETING, INC. f/k/a
EBOATING MARKETING
GROUP, INC., a
Florida corporation,

        Plaintiff,

vs.                                                          CASE NO.:    8:02-CV-760-T-23-TGW

BOATS.COM, a Delaware
corporation,

        Defendant.

_____/

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff, Nautical Solutions Marketing, Inc. f/k/a Eboating Marketing Group, Inc. ("Nautical" or "Plaintiff") submits this memorandum of law in support of Nautical's Motion for Summary Judgment and alleges as follows.

    I.    <u>**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

The following material facts are undisputed.

    1.    The plaintiff, Nautical Solutions Marketing, Inc. is a Florida corporation with its principal place of business located in Pinellas County, Florida.

    2.    Nautical owns and operates a web site called YachtBroker.com. *See* Horne Declaration ¶ 3.

    3.    The Defendant, Boats.com is a Delaware corporation originally headquartered in San Francisco, California and now located in Chicago, Illinois. *See* Answer and Affirmative



Defenses to Amended Complaint, ¶ 6.

4. Boats.com owns and operates a web site known as YachtWorld.com. *See* Answer and Affirmative Defenses to Amended Complaint, ¶ 6.

5. YachtWorld.com is a web site on which yacht brokers can list yachts for sale. Part of the YachtWorld.com site can be accessed only through use of a password. The remainder of the site can be accessed by anyone with an internet connection and does not require the use of a password to gain access. *See* Horne Declaration at ¶ 8.

6. Brokers who list yachts for sale on YachtWorld.com must enter into a contract with the Defendant in order to do so. A true and correct copy of the YachtWorld.com broker contract in effect in 2002 is attached as Exhibit A to this motion.

7. The YachtWorld.com web site contains terms and conditions of use. Such terms and conditions of use in effect in 2002 are attached as Exhibit 2 to this motion.

8. A copy of YachtWorld.com's current home page is attached as Exhibit 3 to this motion.

9. A copy of a yacht listing from YachtWorld.com is attached as Exhibit D to the Declaration of Barbara Tierney, which is attached as Exhibit 4 to this motion.

10. A yacht listing on YachtWorld.com or anywhere typically contains one or more photograph's of the yacht and a description of the yacht. The description includes, among other things, a list of facts such as the make, model, year, length, price and location of the yacht. It also may include a narrative description of the yacht, describing the yachts accommodations, the galley, electrical features, sails and rigging (if the vessel contains sails) and the like. *See* Tierney Decl. ¶¶ 5, 6.

11. YachtBroker.com allows yacht brokers to list yachts for sale on its web site. *See*

Corp. Rep. Depo. at p. 34.

12.     Among the services available on Yachtbroker.com is the ability to search for a yacht on YachtBroker.com's data base of yachts, using as search criteria the make, model, year, length and/or price of the yacht. YachtBroker.com's data base includes (a) yachts listed for sale on the Yachtbroker.com web site and (b) the make, model, price and year of yachts which are listed on the non-password protected (hereinafter "public") areas of certain other internet web sites, including YachtWorld.com. *See* Corp. Rep. Depo. at pp. 61, 70-72.

13.     Yachtbroker.com obtains such factual information about yachts from the public areas of other web sites through a computer software which it calls "rover". Yachtbroker.com used the rover to obtain factual information about yachts on the internet from approximately December 2001 to date. During that time, the rover visited the YachtWorld.com site on twenty (20) consecutive days of every month, between the hours of 1:00 a.m. and 2:00 a.m. PST. The YachtWorld.com site resides on computer servers located in British Columbia, Canada. The rover stayed at the YachtWorld.com site for less than one hour during each visit. The rover looked at yacht listings on the public area of the YachtWorld.com site, made a record of the yachts listed by make, model, year and price of the yacht, (and in some instances the location of the yacht), and the uniform resource locator of the yacht ("URL") which is the location of that yacht listing on the internet. *See* Corp. Rep. Depo. at pp. 70-72. The rover then put that factual information into a data base maintained on the server used by YachtBroker.com. *Id.* at p. 70. A visit by the rover to the YachtWorld.com site is the equivalent of one person visiting that site. *Id.* at p. 80.

14.     The rover does not copy and has never copied photographs or descriptions of yachts contained in yacht listings, either in whole or in part. *See* Corp. Rep. Depo. at pp. 71-72;

Sharpe Deposition at pp. 117-118.

15. Yachtbroker.com hosted web sites for yacht brokers who contracted to list yachts on the Yachtbroker.com site. A yacht broker who listed yachts on the Yachtbroker.com web site could give a temporary password to the Yachtbroker.com web site to his or her customer to allow the customer to search for a yacht on the Yachtbroker.com data base using the yacht make, manufacturer, price and year as search criteria. *See generally,* Corp. Rep. Depo. at p. 119. For these yachts which met the customers' search criteria, listed on YachtBroker.com by brokers, the results might include pictures of the yacht and other descriptions. For those yachts meeting the customers' search criteria but not listed by brokers on the YachtBroker.com web site (yachts found by the rover on public access sites), the results of the search were limited to information regarding the make, manufacturer, price, year, and location. If the customer wanted to pursue purchasing a yacht located through the Yachtbroker.com search engine, the customer would contact his or her broker who had given him access to the Yachtbroker.com search engine and such yacht broker would use the Quickview Number to go to the web site on which such yacht was listed for sale, obtain the contact information for the listing broker, and then approach that broker about the sale of the boat. *See* Corp. Rep. Depo. at pp. 24, 119. This process gave brokers who used the services of Yachtbroker.com opportunities for co-brokering boats. The listing broker, however, was free to refuse to co-broker and was under no obligation to sell the yacht through the inquiring broker.

16. Co-brokering is widely used in the yacht sales industry. Through the rover, its data base, and search engine, Yachtbroker.com assisted web sites, such as YachtWorld.com, by bringing more traffic to their web site. The more traffic a site gets, the more valuable is the site. This also assisted yacht sellers and their listing brokers, because it gave their yachts exposure to

more brokers and more potential qualified purchasers and thereby increased the potential to make a sale. It assisted yacht purchasers and their brokers because it simplified the process of looking for a yacht by facilitating the search of all or most of the yachts available for sale on the internet in a single web site location.

17. Yachtbroker.com also offered a service whereby an employee of Yachtbroker.com would go to an internet site on behalf of a broker and copy the brokers listing (photo and description) and paste that listing on any other internet site designated by the broker. *See* Corp. Rep. Depo. at pp. 34-36. Yachtbroker.com used that service, known as its valet service, to copy listings from the YachtWorld.com site on behalf of brokers who owned such listings. *Id.* at pp. 50, 152. Yachtbroker.com only copied listings using its valet service when authorized and directed to do so by the broker who owned such listing. *Id.* at p. 34. The listing broker, after hiring YachtBroker.com as its agent to make a copy of his or listing and paste it to another location, gave YachtBroker.com his or her user name and password, which enabled YachtBroker.com to get to the portion of the YachtWorld.com site from which the broker's listing could be copied. *Id.* at pp. 34-36.

18. The photos and the descriptions contained in the yacht listings on YachtWorld.com are created or supplied by the listing brokers and are owned by the listing broker rather than by YachtWorld.com. *See* Terms and Conditions of YachtWorld.com; Exhibit 3. *See* Muffett Deposition pp. 83; 89-90

19. In March, 2002 Yachtbroker.com approached YachtWorld.com about doing business together and described its services to YachtWorld.com. On or about April 5, 2002 Jessica Muffet of YachtWorld.com wrote to Yachtbroker.com demanding that it cease rovering the YachtWorld.com web site. YachtWorld.com contended that Yachtbroker.com was violating

the terms and conditions of use of the YachtWorld.com web site, thereby trespassing its site, and was infringing YachtWorld.com's copyrights in its web site. Yachtbroker.com immediately stopped rovering the YachtWorld.com web site and deleted from the Yachtbroker.com data base all information about yachts listed on YachtWorld.com, but disagreed that its conduct violated the terms and conditions of use, amounted to a trespass or infringed YachtWorld.com's copyrights. *See* Sharpe Deposition at pp. 33; 57.

20. YachtWorld.com claims to own the copyright in the "look and feel" of its web site. This includes the headings used in the yacht descriptions, the factual information about listed yachts, such as their make, manufacturer, price and length, the location of the headings on a page, the location of photographs of boats on a web page and the colors used on their web pages.

21. The headings used in yacht descriptions in yacht listings on YachtWorld.com are industry standard terms and are merely descriptive of the information that follows them. For example, the heading "Electrical" is used to describe the electrical features of a yacht. The information following the term "Electrical" on the YachtWorld.com site is information describing the electrical features of a yacht. The listing broker on YachtWorld.com selects the headings to use, the order in which the headings are used, the location of photographs on the listing and the words used to describe the yacht in the listing. *See* Tierney Decl. ¶¶ 5, 6.

22. The Defendant's corporate representative cannot identify any actions by Nautical that damaged the Defendant's servers. *See* Muffett Deposition at pp. 290; 299.

II. **STANDARD FOR GRANTING MOTION FOR SUMMARY JUDGMENT**

Rule 56 (c) of the Federal Rules of Civil Procedure states that a court may grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citations omitted).

A factual dispute will be "genuine" if the Court determines that the evidence in the record is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if the Court determines, based on the substantive law of the case, that the dispute "might affect the outcome of the suit." *Id.*

Although Rule 56 provides that all reasonable inferences will be made in favor of the non-moving party when the Court rules upon a motion for summary judgment, the non-moving party may not merely rest upon the mere allegations or denials in its own pleadings to withstand a motion for summary judgment, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. *Comer*, 265 F.3d at 1192.

### III. NAUTICAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS DECLARATORY JUDGMENT COUNT BECAUSE NAUTICAL HAS NOT INFRINGED THE DEFENDANT'S COPYRIGHTS.

Plaintiff has not infringed any copyrights belonging to Defendant. There are two elements to a copyright infringement claim. The first element is ownership of a valid copyright. *Mitek Holdings, Inc. v. Arce Engineering Co., Inc.*, 89 F.3d 1548, 1553 (11th Cir. 1996), quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The second element is copying of copyrightable elements of Plaintiff's work. *Id.* Defendant cannot establish either element.

First, it is a matter of undisputed material fact that Defendant has neither obtained nor

registered a copyright in any of the information contained on its website. Defendant has offered no evidence that it possesses a valid copyright registration certificate for the content of its website, which certificate would be *prima facie* evidence of the ownership of a valid copyright in the content of the website. *See* 17 U.S.C. § 410 (c); *see also Block State Testing Services, L.P. v. Kontractor's Prep. Corp.*, 4 F. Supp.2d 1365, 1366 (M.D. Fla. 1997).

Second, there is no disputed issue of material fact that the only material that was copied by Plaintiff from Defendant's website, both through its rover and its valet service, was purely factual material that is not copyrightable. Copyright protection only extends to original expression, "not to ideas, procedures, processes, or systems, regardless of their originality." *Palmer v. Braun*, 287 F.3d 1325, 1330 (11th Cir. 2002), citing 17 U.S.C. § 102(b), *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001), and *Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000). Facts are not original and thus are not protected by copyright law. *Feist Publications, Inc. v. Rural Telephone Service Co. Inc.*, 499 U.S. 340, 348, 111 S. Ct. 1282 (1991) (facts "may not be copyrighted and are part of the public domain available to every person".) The Plaintiff's rover gathers limited factual information about yachts from the Defendant's (and others') publicly accessible website, like the URL (web) address where the yacht listing can be accessed, the make, manufacturer, length, price, and geographical location of the vessel. This information is the basic factual information used by yacht brokers to list any vessel for sale. It is not unique to the Defendant and is not the result of some selection process by the Defendant.

Similarly, the only material copied using the valet service was the factual description and photograph from the yacht listings which are owned by the listing broker but located on the Defendant's website. The Plaintiff copied the factual descriptions of the yacht listings, as the listing

8

broker's agent, for purposes of posting the listing for that broker's yachts on one or more other sites.

The Defendant acknowledges that the broker, not the Defendant owns the listing, including the photographs and the description of the yacht.

Even if someone creates a unique expression of an idea, copyright protection does not extend to protect that expression if there are only a few ways to express the idea. In such an instance, the idea and expression merge and those expressions will not be copyrightable because "protection of the expressions would thus extend protection to the idea itself." *Palmer*, 287 F.3d at 1330, citing *Warren Publ'g, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1518 n.27 (11th Cir. 1997).

The words "make", "manufacturer", "price", "length" and "location" merge with the idea of listing a yacht for sale. These are the basic concepts that yacht brokers have always used to describe a vessel that is offered for sale. Such expression, therfore, merges with the idea of listing a yacht for sale and so those terms are not copyrightable expression.

The headings used in the narrative descriptions of the yacht listings are not copyrightable for the same reason. Use of the words "accomodations" to describe the accomodations of a yacht, "galley" to describe a yacht's galley, "electrical" to describe the electrical features of a yacht, and "sails and rigging", to describe a yacht's sails and rigging, merges expression and idea. These are industry standard terms that brokers have used long before the Defendant even had a web site to describe yachts listed for sale. In any event, these terms are selected by the listing broker, so the Defendant is not their author.

Defendant cannot assert the exclusive right to use these descriptive headings to describe categories of features of vessels being offered for sale. These descriptive terms are simply not sufficiently original for Defendant to lay sole claim to the use of these terms to express the idea of

classifying features of vessels being offered for sale via the Internet. Nor is the layout of the listing on the web site page sufficiently original to enjoy copyright protection. Attempts to assert copyright protection to such descriptive terms and their layout have been previously rebuffed in this Circuit.

In *BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.*, 999 F.2d 1436, 1442 (11th Cir. 1993), a publisher of a business directory sued a competitor whom also published a business directory. Although the court noted certain similarities in the expressions used in both directories, the court refused to hold that the defendant had infringed any copyright because of its application of the merger doctrine. Because there were only a few ways to express the ideas embodied in the business directory, the court held that the particular expression embodied in Plaintiff's arrangement of terms in the directory, as well as the names used to identify particular terms in the directory, had "merged" with the idea of creating a business directory, and these expressions were therefore not copyrightable. "The relevant inquiry is not whether there is some imaginable, although manifestly less useful, method of arranging business telephone listings . . . The pertinent inquiry is whether the compiler has demonstrated originality, the '*sine qua non*' of copyright, in *its* arrangement or coordination." *Id.* at 1443. Applying this test, the court refused to provide copyright protection to such generic terms as "attorneys" and "banks" used in Plaintiff's directory because these terms "represent[ed] such an obvious label for the entities appearing under these headings as to lack the requisite originality for copyright protection." *Id.* at 1444; *see also Matthew Bender & Co. v. Kluwer Law Book Publishers, Inc.*, 672 F. Supp. 107, 111 (S.D.N.Y. 1987) ("under merger doctrine, plaintiff could claim no copyright protection in headings used to display data regarding personal injury awards where 'terms employed are the most logical and clear way of expressing the idea to be conveyed . . . [and] these terms, or synonyms for them, are the only way

10

of conveying the desired information.").

Although the factual information on the Defendant's website is not in itself protected, the yacht listing web pages may, under certain circumstances, be protected as a compilation.1 *See* 17 U.S.C. § 103(a). However, "[t]he copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *See* 17 U.S.C. § 103(b). The Defendant cannot extend protection to the underlying factual information even if it can establish a valid copyright in the yacht listing webpage as a whole under a compilation theory.

"Even if a work qualifies as a copyrightable compilation, it receives only limited protection." *Feist Publications*, 499 U.S. at 359, 111 S. Ct. at 1294. To determine whether a compilation copyright has been infringed, the Eleventh Circuit applies the virtual identicality standard. *See Mitek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1558-59 *citing Apple Computer, Inc. v. Microsoft Corp.* 35 F.3d 1435, 1446 (9th Cir. 1994) (noting that, in the case of alleged infringement of a work as a whole (*i.e.*, a compilation), "there can be no infringement unless the works are virtually identical"), *cert. denied*, 513 U.S. 1184, 114 S.Ct. 1176, 130 L.Ed.2d 1129(1995); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) (stating that "[a]s with factual compilations, copyright infringement of compilations consisting of largely uncopyrightable elements should not be found in the absence of 'bodily appropriation of expression'"). A comparison of the yacht listings on the Yachtbroker.com website to those on the yachtworld.com website shows that the yacht listings are substantially different. *See* Horne Decl. ¶¶ 5, 6. The yacht listings are not

---

1     The Defendant has stated that the "look and feel" of its website is protected and has been infringed by the Plaintiff. The "look and feel" of a yacht listing is analagous to a computer screen display which is protected, if at all, as a compilation.

11

virtually identical and thus there would be no copyright infringement even if the yacht listing was protected as a compilation.

Finally, as a procedural matter, it is not disputed that there is an actual controversy of a justiciable nature between Plaintiff and Defendant concerning whether Plaintiff's activities infringe upon any of the Defendant's copyrights. The Defendant has attacked the Plaintiff's activities, which are at the core of Plaintiff's business model, as an infringement of Defendant's copyrights and sent a cease and desist letter to Plaintiff as a precursor to a lawsuit.

Accordingly, Plaintiff moves for summary declaratory judgment, declaring that Plaintiff's boat rover and valet service activities do not violate or infringe upon any copyrights of the Defendant.

### IV. NAUTICAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS DECLARATORY JUDGMENT COUNT BECAUSE NAUTICAL HAS NOT VIOLATED THE DEFENDANT'S TERMS OF USE AND HAS NOT COMMITTED A TRESPASS.

Defendant has accused Plaintiff of trespassing upon its website by violating the Terms and Conditions of Use for Defendant's website. In its cease and desist letter to Plaintiff, YachtWorld.com wrote, "the use of our content in a linking situation via your product "Rover" constitutes a form of trespass and is an infringement of our copyrights and terms of use". The terms of use contains a paragraph entitled "Links", but its says nothing about linking to the YachtWorld.com site. Instead, it disclaims responsibility for other sites to which YachtWorld.com has created links. The YachtWorld.com site terms of use also contain language that pertains to the collection of data, which is what the Rover does, but it says only that a site visitor shall not use the site to "collect or store personal data about others." See Terms and Conditions of Use, Interactive

Areas, ¶ 7. The Terms and Conditions of Use also prohibit the use of the Interactive Area to "alter, delete, interfere with or otherwise damage any Web site content". Id. at ¶ 11. There is no evidence whatsoever that Plaintiff, either through its rover or otherwise, altered or otherwise damaged the content of any web site content. Moreover, the Defendant's corporate representative on the issue of damage, Jessica Muffett, testified that the Defendant had no knowledge of the Plaintiff damaging the Defendant's web site. Muffett depo. at p. 299.

There also is no disputed issue of material fact that Plaintiff did not trespass upon the Defendant's site. Federal district courts sitting in Florida that are deciding a tort claim, including trespass, are required by Florida choice of law rules to apply the "most significant relationship" test to determine which state's law applies to the resolution of a tort claim. *Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115-1116 (11th Cir. 1996), citing *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980). In determining which place has the requisite relationship, the factors to be considered include: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* at 1116, citing *Restatement (Second) of Conflict of Laws § 6*. However, the law of the state where the injury occurred will apply only when there is no other state with a more significant interest. *Crowell v. Hyder Trucking Lines, Inc.*, 700 So.2d 120, 123 (Fla. 2d DCA 1997).

In this case there has been no damage or injury, so that factor is not relevant to the choice of law issue. There is no evidence that Plaintiff's conduct damaged either the Defendant's web site or servers. Muffett depo. at p. 290 and 299. S. Sharpe depo. at pp. 112-114. The rover was launched

13

from a computer in California to the Defendant's servers in British Columbia and wrote the limited factual data that it gathered to a data base initially residing on a computer in California. Horne Decl. ¶ 7. Moreover, the Defendant's Terms and Conditions of Use governing the use of the Defendant's web site provide that they are to be "governed by and construed in accordance with the laws of the State of California". The Terms and Conditions of the Defendant's Broker contracts, which provide that the brokers own the content in their listings, likewise is governed by California law. (Exhibit 1) The Plaintiff is incorporated and headquartered in Florida and the Defendant is incorporated in Delaware and headquartered in Illinois, although it initially was headquartered in California. Many states have a nexus with this dispute but California appears to have the most significant relationship.

Under California law, the tort of trespass to chattels lies only when an intentional interference with the possession of the chattels or personal property has occurred which has proximately caused injury to the chattels or to the owner's rights to the chattels. *Intel v. Hamidi*, 1 Cal. Rtr.3d 32, 39 (Ca. 2003). In *Hamidi*, the issue before the California Supreme Court was whether a former employee who flooded his former employer's e-mail system could be held liable for the tort of trespass to chattels (the chattels being the computer system). The court refused to hold the former employee liable because there was no evidence of interference, much less injury:

> [T]he undisputed evidence revealed no actual or threatened damage to Intel [Plaintiff]'s computer hardware or software and no interference with its ordinary and intended operation. Intel was not dispossessed of its computers, nor did Hamidi [Defendant]'s messages prevent Intel from using its computers for any measurable length of time. Intel presented no evidence its system was slowed or otherwise impaired by the burden of delivering Hamidi's electronic messages. Nor was there any evidence transmission of the messages imposed any marginal cost on the operation of Intel's computers. In sum, no evidence suggested that in sending messages through Intel's Internet connections and internal computer system Hamidi used the system in any manner in which it was not intended to function or impaired the system in any way. *Id.* at 41.

14

The court held that under California law, the tort of trespass to chattels "does not encompass, and should not be extended to encompass, an electronic communication that neither damages the recipient computer system nor impairs its functioning. Such an electronic communication does not constitute an actionable trespass to personal property, i.e., the computer system, because it does not interfere with the possessor's use or possession of, or any other legally protected interest in, the personal property itself. *Id.* at 32 (citations omitted).

Plaintiff's access to and interaction with Defendant's website on its computer servers paled in comparison to the "flooding" of e-mail messages that took place on Intel's computer system in *Hamidi* at the hands of a disgruntled former employee. Plaintiff's rover had the effect of a single user visiting the Defendant's site for less than one hour per day. Sharpe depo. at p. 112-114. Moreover, it visited the site from 1:00 a.m. to 2:00 a.m. when the vast majority of YachtWorld.com's broker customers would be sleeping. Id. 2 The Defendant's servers have sufficient capacity to process over 1.2 to 1.5 *million* page views per day, so the one visit by Plaintiff would not even be noticed. Summers at p. 48; Bracer at p. 16. It is not surprising that the Defendant did not even know that YachtBroker.com was rovering its site until Plaintiff called the Defendant on the phone and told them it was doing so. Muffett at p. 288.

The alleged trespasser in *Hamidi*, in contrast, flooded Intel's servers with emails, yet the *Hamidi* court refused to hold Hamidi liable, because there was no evidence of damage or impairment to the computer system as a result of the Hamidi's access to Intel's computer system. Similarly, Defendant has provided no evidence of any damage or impairment to the Defendant's web site or

---

2 Muffett testified that the vast majority of YachtWorld.com's subscribing brokers are located in North America. Muffett at pp. 110-111.

15

to the servers where the website is maintained. Muffett at 290 and 299. Because it is a matter of undisputed material fact that Defendant's servers have not been damaged or impaired by the limited access to the website by Plaintiff, Plaintiff has not committed a trespass upon these chattels (i.e., the servers) or the web site as a matter of law. Plaintiff has not committed any trespass to chattels, regardless of whether it has violated the Defendant's Terms and Conditions of Use (which it has not) and is entitled to summary judgment on Count I of its Amended Complaint and a declaration that its conduct regarding the Defendant's web site does not violate the Defendant's Terms and Conditions of Use and is not a trespass upon the Defendant's web site or servers.

## V. CONCLUSION

WHEREFORE, for the reasons stated herein, Plaintiff is entitled to the entry of summary judgment in its favor on Count I of the Amended Complaint. Plaintiff requests that the Court declare that Plaintiff's conduct regarding the Defendant's web site, YachtWorld.com, does not infringe the Defendant's copyrights, is not a trespass and does not violate the Terms and Conditions of Use of the YachtWorld.com web site.

Dated: August 29, 2003

Respectfully submitted,

NAUTICAL SOLUTIONS MARKETING, INC.

By: /s/ G. Donovan Conwell, Jr.
G. Donovan Conwell, Jr.
Fla. Bar No. 371319
FOWLER WHITE BOGGS BANKER, P.A.
P.O. Box 1438
Tampa, Florida 33601
(813) 228-7411
Counsel for Plaintiff
NAUTICAL SOLUTIONS MARKETING, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served this 29th day of August, 2003 by United States mail this 29th day of August, 2003 upon Anne Mason, Esq., Mason Law, 17757 U.S. Hwy. 19 North, Mangrove Bay, Suite 500, Clearwater, FL 33764.

_____
Attorney